# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* JACK "JAY" PALMER, | §<br>§<br>§ | |
| *Plaintiff,* | §<br>§ | |
| v. | §<br>§ | Civil Action No. 4:17-cv-72<br>Judge Mazzant |
| TATA CONSULTANCY SERVICES, LTD., | §<br>§<br>§ | |
| *Defendant.* | §<br>§ | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Tata Consultancy Services Limited's Motion to Dismiss Amended *Qui Tam* Complaint (Dkt. #65). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **GRANTED**.

## BACKGROUND

This is a *qui tam* action. The Complaint, initiated by Jack "Jay" Palmer ("Relator"), accuses Tata Consultancy Services, Ltd. ("Tata") of misusing the United States visa system by fraudulently procuring H-1B, L-1A, and B-1 visas (Dkt. #64). The Court will begin with a summary of the factual and procedural disposition before turning to the parties' arguments.

### I.    Factual Background

Relator was hired by Comcast Corporation ("Comcast") in 2016 to conduct an audit of Tata and its immigration practices (Dkt. #64 at p. 8). Tata is a global information technology and consulting services company headquartered in Mumbai, India, with approximately nineteen offices in the United States (Dkt. #64 at p. 8; Dkt. #65 at p. 9). Tata "contracts with U.S. companies to provide IT-related services" and hires individuals to fill positions to service those clients (Dkt. #64

at p. 9). "Tata prefers to staff open U.S. positions with foreign workers for whom Tata secures visas" (Dkt. #64 at p. 9). According to Relator's Amended Complaint, Tata employs nearly 30,000 workers in the United States, at least 76% of whom require an H-1B, L-1A, or B-1 visa (Dkt. #64). Because the distinction between these three types of visas is meaningful to this case, the Court briefly introduces each type below.

### A.    H-1B Visas

H-1B visas are intended to temporarily bring foreign workers to the United States to perform specialized work when there are insufficient workers in the United States to perform a specific job. 8 C.F.R. § 214.2(h)(1)(ii)(B). To qualify for an H-1B visa, "[a]pplicants must have at least a bachelor's degree, or equivalent experience in the specialty occupation."[1] The application process requires an employer to file a Labor Condition Application ("LCA") with the Department of Labor. *See* 20 C.F.R. § 655.730. The LCA must contain, *inter alia*, the worker's occupational title, gross wage, start and end dates, and place(s) of intended employment. *Id.* § 655.730(c)(4). The employment for which the LCA is submitted must be "non-speculative"—the position must actually exist when the application is filed. *Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F. Supp. 3d 63, 65 (D.N.J. 2021). Further, the employer must verify that the recipient of the H-1B visa will be paid the greater of: (a) the actual wage rate paid by the employer to all other individuals with similar experience and qualifications for the position, or (b) the prevailing wage rate for the occupational classification in the area of intended employment. 20 C.F.R. § 655.731(a). An H-1B specialty

---

[1]   U.S. Department of State – Bureau of Consular Affairs, *U.S. Visas, Temporary Worker Visas*, TRAVEL.STATE.GOV, https://travel.state.gov/content/travel/en/us-visas/employment/temporary-worker-visas.html#overview.

occupation worker may work in the United States for up to three years, with the opportunity to extend the H-1B visa for three more years.[2]

The H-1B application process is highly competitive. Each year, United States Citizenship and Immigration Services ("USCIS") places a strict cap on the number of new H-1B visas it may issue each year. *Id.* USCIS awards only 65,000 new H-1B visas annually, with an additional 20,000 petitions reserved for individuals with advanced degrees. *Id.* The filing period for this lottery system typically begins in April.[3] While the total fee for an H-1B visa varies according to the type of employer, Relator submits that the fee for a company like Tata to secure an H-1B visa would be $6,460 (Dkt. #64 at p. 11).

### B.    L-1A Visas

L-1A visas are intended for intracompany transferees. 8 C.F.R. § 214.2(l)(1)(i). The L-1A classification enables an employer to "transfer an executive or manager from one of its affiliated foreign offices to one of its offices in the United States."[4] An applicant is qualified to receive an L-1A visa when that applicant has worked for their employer abroad for at least one continuous year within the preceding three years and seeks to provide services to their employer in an executive or managerial capacity. 8 C.F.R. § 214.2(l)(1)(ii)(A). L-1A visa recipients are permitted to stay in the United States for an initial three-year period, after which the employee may request an extension

---

[2]  U.S. Citizenship and Immigration Services, *Working in the United States*, H-1B SPECIALTY OCCUPATIONS, https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations.

[3]  U.S. Citizenship and Immigration Services, *Working in the United States*, H-1B CAP SEASON, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations/h-1b-cap-season.

[4]  U.S. Citizenship and Immigration Services, *Working in the United States*, L-1A INTRACOMPANY TRANSFEREE EXECUTIVE OR MANAGER, https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager.

to seven years.[5] The L-1A visa application process is less strict than the H-1B process; there is no lottery system, annual cap, or wage requirement to receive an L-1A visa. *Franchitti*, 555 F. Supp. 3d at 66. Relator contends that the fee for a company like Tata to secure an L-1A visa would be $5,460 (Dkt. #64 at p. 11).

### C.     B-1 Visas

B-1 visas are intended for temporary business visitors. 8 C.F.R. § 214.2(b)(1). The B-1 classification is reserved for short-term visitors wishing to enter the United States to, *inter alia*, consult with business associates, travel for a business convention or conference, participate in business-related training, or negotiate a contract.[6] Critically, a recipient of a B-1 visa is not authorized to accept employment or work in the United States.[7] Instead, the B-1 visa effectively operates as a license to temporarily enter the United States for a discrete business purpose for up to six months, with an option to extend the worker's stay for another six months.[8] The cheapest of the three visas discussed, a B-1 visa only has a $160 application fee.[9] Like its L-1A counterpart, there is no lottery process to obtain a B-1 visa. *See id.*

---

[5]  U.S. Citizenship and Immigration Services, *Working in the United States*, L-1A Intracompany Transferee Executive or Manager, https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager.

[6]  U.S. Citizenship and Immigration Services, *Working in the United States*, B-1 Temporary Business Visitor, https://www.uscis.gov/working-in-the-united-states/temporary-visitors-for-business/b-1-temporary-business-visitor.

[7]  U.S. Department of State – Bureau of Consular Affairs, *U.S. Visas, Visitor Visa*, Travel.State.Gov, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visitor.html.

[8]  *See* U.S. Citizenship and Immigration Services, *Working in the United States*, B-1 Temporary Business Visitor, https://www.uscis.gov/working-in-the-united-states/temporary-visitors-for-business/b-1-temporary-business-visitor.

[9]  U.S. Department of State – Bureau of Consular Affairs, *U.S. Visas, Visitor Visa*, Travel.State.Gov, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visitor.html. Currently, the fee for a B-1 visa is $185. *Id.* However, at the time Relator filed his Amended Complaint, the fee was $160 (Dkt. #64 at p. 12).

With the stage set, the Court returns to Relator's factual contentions. Relator alleges that, throughout his audit of Tata, he observed multiple types of fraud in Tata's visa application procedures for each type of visa listed above.

First, Relator contends that Tata falsely submits prospective H-1B visa applications for positions that do not exist (Dkt. #64 at ¶ 9). According to Relator, this practice involves Tata falsifying employee roles listed in the H-1B visa petitions and falsely certifying that the visa recipient would work in a specialty occupation, as required by USCIS for an H-1B application (Dkt. #64 at ¶ 9). *See supra* Section I.A. In reality, however, Relator argues that Tata uses these employees to perform non-specialized work when they arrive to the United States (Dkt. #64 at ¶ 9). This allows Tata "to have an inventory of 'visa-ready workers' in India, available to travel to the U.S. at a moment's notice once or if the work becomes available" (Dkt. #64 at ¶ 9) (cleaned up). Because H-1B visas are only available to fill *existing* positions that require *specialized* work, *supra* Section I.A, Relator submits that Tata has defrauded the United States visa system (Dkt. #64 at ¶¶ 9–10). The goal? To enable Tata "to calculatedly pay its H-1B visa workers less than the required 'prevailing wage rate,' in violation of 20 C.F.R. § 655.731(a)" by paying its visa-reliant employees substantially less than those that do not require a visa (Dkt. #64 at ¶ 10).

Relator avers that Tata's alleged visa fraud enables it to game the H-1B lottery system and procure the maximum number of H-1B visas possible each year (Dkt. #64 at ¶ 31). To illustrate the impracticality of Tata's visa application procedures, Relator directs the Court to Tata's annual application numbers (Dkt. #64 at ¶ 31). Relator alleges that Tata received 7,936 new visas in 2015 and 11,295 in 2016, for a total of 19,231 approved H-1B visas over two years (Dkt. #64 at ¶ 31). According to Relator, given the approximately 33% approval rate of H-1B visas through the lottery

system, for Tata to receive that many H-1B visas, it likely would have submitted 25,000 to 30,000 applications in each of those years (Dkt. #64 at ¶ 31). According to Relator, that math does not compute given that Tata only employs roughly 29,900 individuals in the United States (Dkt. #64 at ¶ 31). To hide this fraudulent scheme, Relator alleges that Tata "engages in threats and manipulation of its employees to give 'kickbacks' and to keep 'quiet' about wrongdoings and crimes" under the threat of losing their job (Dkt. #64 at ¶ 33) (cleaned up). After conducting interviews during his audit of Tata, Relator discovered that more than 60% of Tata's employees were on the wrong visa, in the wrong role, or fell victim to lower pay and abuse by their employer (Dkt. #64 at ¶ 36). Finally, Relator found that, instead of paying its H-1B workers the greater of the actual wage rate or prevailing wage rate, *see supra* Section 1.A, Tata paid its H-1B workers 30% less than their non-visa-reliant colleagues (Dkt. #64 at ¶ 37).

Second, Relator submits that, in an effort to circumvent the stricter H-1B requirements and lottery system, Tata falsely applies for L-1A visas for technical employees who work non-managerial roles in the United States (Dkt. #64 at ¶ 39). To do so, Relator asserts that Tata falsifies job titles and responsibilities in the visa petitions to suggest that certain employees are managers when, in fact, they are not (Dkt. #64 at ¶ 39). According to Relator, this scheme allows Tata to maximize the number of L-1A visas it can receive from the government, then turn around and improperly assign those L-1A visa recipients to non-managerial positions that differ from those described in their fraudulent petitions (Dkt. #64 at ¶¶ 39–40). If stockpiling visas is the goal, Relator contends that Tata has met it (Dkt. #64 at ¶ 39). Indeed, from 2002 to 2011, Tata sponsored 25,908 L-1 visas, more than any other company in the United States (Dkt. #64 at ¶ 39). Relator adds that Tata received 1,606 L-1 visa approvals in 2015 and 1,615 in 2016 (Dkt. #64 at ¶ 39).

The allegations do not stop there. To perpetrate this alleged L-1A visa fraud, Relator contends that Tata evades detection by USCIS Fraud Detection and National Security officers who make unannounced site visits to ensure compliance with the L-1A requirements (Dkt. #64 at ¶ 41). According to Relator's Complaint, Tata's scheme remains undetected because its corporate human resources team "instruct[s] all accounts to make backend changes in Tata's online Ultimatix system to conform L-1A visa holders' employee information to their visa petitions" (Dkt. #64 at ¶ 41). In other words, Tata edits the roles and reporting structures in each account to match the management-level roles indicated in their corresponding L-1A visa petitions (Dkt. #64 at ¶ 41). Finally, Relator avers that Tata instructs its employees to directly lie to USCIS about their job titles and responsibilities (Dkt. #64 at ¶ 41). USCIS is none the wiser, allowing Tata to secure visa extensions to keep its L-1A visa holders in the United States for up to seven years (Dkt. #64 at ¶ 42). According to Relator, Tata's endgame is to secure L-1A visas for specialized employees that would otherwise require an H-1B visa so that the company can save $1,000 for each visa petition it submits ($5,460 for an L-1A visa compared to $6,460 for an H-1B visa) (Dkt. #64 at ¶ 43).

Third and finally, Relator argues that Tata falsified its B-1 applications (Dkt. #64 at ¶¶ 44–46). In an effort to bypass the stricter and more expensive H-1B and L-1A visa processes, Relator asserts that Tata improperly secures B-1 visas to bring foreign employees to the United States to perform skilled and unskilled labor that would otherwise be performed by H-1B holders or United States citizens (Dkt. #64 at ¶ 44). Relator considers it a "common" practice for Tata to use B-1 visa holders to perform skilled and unskilled labor in the United States for six weeks at a time, in violation of United States visa laws and regulations (Dkt. #64 at ¶ 45). *See supra* Section I.C.  Once again, money motivates the scheme. Indeed, by retaining short-term employees on B-1 visas to

perform specialized work that would otherwise be reserved for H-1B visa holders, Tata stands to save $6,300 for each B-1 visa holder ($160 for a B-1 visa compared to $6,460 for an H-1B visa) (Dkt. #64 at ¶ 46).

## II.    Procedural Background

Relator timely filed his *qui tam* Complaint on January 31, 2017 (Dkt. #1). *See* 31 U.S.C. § 3731(b)(1). After multiple extensions of the seal period, the United States was given until August 5, 2022 to intervene (Dkt. #42). The United States declined to intervene (Dkt. #44; Dkt. #45). On March 3, 2023, Relator filed an Amended Complaint (Dkt. #64). Relator's complaint, as amended, asserts three violations of the False Claims Act ("FCA") (Dkt. #64 at ¶ 48). First, Relator asserts that Tata knowingly presented, or caused to be presented, to employees of the United States, false and fraudulent claims for property or approval, in violation of 31 U.S.C. § 3729(1)(1)(A) (Dkt. #64 at ¶ 48). Second, Relator alleges that Tata knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B) (Dkt. #64 at ¶ 48). Third and finally, Relator contends that Tata knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G) (Dkt. #64 at ¶ 48).

Tata filed the instant Motion to Dismiss on April 7, 2023 (Dkt. #65). On May 5, 2023, Relator filed a Response (Dkt. #74). Tata replied on May 26, 2023 (Dkt. #75). While Tata's Motion to Dismiss was pending, Tata filed a Notice of Supplemental Authority on February 15, 2024 (Dkt. #79). Through it, Tata directs the Court to a recent opinion from the United States District Court

for the District of Columbia, where Tata was a party to a separate, similar *qui tam* action (Dkt. #79;

Dkt. #79-1) (citing *United States ex rel. Kini v. Tata Consultancy Servs., Ltd.*, No. 17-CV-2526 (TSC),

2024 WL 474260 (D.D.C. Feb. 7, 2024)). The *Kini* court granted Tata's motion to dismiss on

grounds similar to those raised here. *See Kini*, 2024 WL 474260, at *7. Thus, Tata instructs the

Court to follow the *Kini* court and dismiss this action (Dkt. #79). On February 29, 2024, Relator

filed a Response to Tata's Supplemental Authority, urging the Court not to follow *Kini* because it

is not binding and should not persuade the Court (Dkt. #80).

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that each claim in a complaint include a

"short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P.

8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the

speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint

fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering

a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the

plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City

of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any

documents attached to the complaint, and any documents attached to the motion to dismiss that

are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays

Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the

complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when

the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

Because the FCA sounds in fraud, claims brought under the FCA must be pleaded with particularity under Rule 9(b). *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike suits, and prevent[] plaintiffs from filing baseless claims." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)). Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, this requirement "does not 'reflect a subscription to fact pleading.'" *Grubbs*, 565 F.3d at 186. "Claims alleging violations of the Texas Insurance Code and the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the requirements of Rule 9(b)." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998); *see Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at *14 (N.D. Tex. Aug. 26, 2010) ("'[W]hen the parties have not urged a separate focus on the negligent misrepresentation claims,' the Fifth Circuit has found negligent misrepresentation claims subject to Rule 9(b) in the same manner as fraud claims."). Failure to comply with Rule 9(b)'s

requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

## ANALYSIS

Tata's moves to dismiss Relator's complaint on four separate grounds (Dkt. #65 at pp. 7–8). First, Tata submits that Relator failed to plausibly plead an affirmative FCA claim because "visas are not property for purposes of an FCA claim" (Dkt. #65 at p. 7). Second, Tata challenges the adequacy of Relator's reverse false claim theory because, according to Tata, its "contingent or potential obligations to pay the government" do not constitute "established obligation[s]" that are necessary to support a reverse false claim theory (Dkt. #65 at p. 7). Third, Tata argues that the FCA's "Tax Bar" precludes Relator's FCA claims (Dkt. #65 at p. 8). Fourth and finally, Tata contends that Relator's claims do not meet the heightened pleading standards under Rule 9(b) because they lack "any particularized detail as to the 'who, what, when, where, and how' of the alleged fraud" (Dkt. #65 at p. 8) (citing *United States ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 382) (5th Cir. 2014)). The Court addresses each argument in turn.

## I.    Relator's Affirmative FCA Claims

The Court begins with Relator's affirmative FCA claims. The FCA creates civil liability for persons who present false or fraudulent claims for payment to the Federal Government. 31 U.S.C. § 3729(a)(1)(A) *et seq.* The first two sections of the FCA impose liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim." *Id.* §§ 3729(a)(1)(A), (a)(1)(B). Tata refers to these as "affirmative" FCA claims (Dkt. #65 at pp. 7–8, 16). A "claim" under the FCA is "any request or demand . . . for money or property." *Id.* § 3729(b)(2).

Relator asserts that Tata violated both "affirmative" FCA provisions by falsifying employee roles in H-1B visa petitions, fraudulently obtaining L-1A visas for employees in non-managerial roles, and improperly utilizing B-1 visa workers to perform skilled and unskilled labor that should be reserved for H-1B visa holders or non-visa-reliant employees (Dkt. #64 at ¶ 48). Tata disagrees. Tata insists that Relator's affirmative FCA claims are not cognizable because Tata never made a "claim" for payment from the Federal Government (Dkt. #65 at p. 13) (citing *United States ex rel. Marcy v. Rowan Cos., Inc.*, 520 F.3d 384, 388 (5th Cir. 2008)). With that "threshold issue" unsatisfied, Tata urges the Court to dismiss Relator's affirmative FCA claims (Dkt. #65 at p. 13) (citing *Marcy*, 520 F.3d at 388). Thus, the Court arrives at its first hurdle: whether Relator has identified a "claim" for "money or property" necessary to support an affirmative FCA claim. *See* 31 U.S.C. §§ 3729 (a)(1)(A), (a)(1)(B), (b)(2). Relator has not.

As discussed, the "false claim" upon which Relator's affirmative FCA claims rest is Tata's submission of fraudulent visa applications (*See* Dkt. #64 at ¶ 48). But "while the underlying fraud that invokes the FCA differs under § 3729(a), 'the statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.'" *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009). Indeed, it is not the false statement itself that gives rise to FCA liability; there must be a *claim*. In other words, "[t]here is no [FCA] liability . . . for a false statement unless it is used to get false claim[s] paid." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003). That payment can

13

come in one of two forms: money or property. 31 U.S.C. § 3729(b)(2). Thus, for FCA liability to attach under these facts, the visas must be classified as either money or property. Tata contends that they are neither. Tata is right.

The Court begins with the question of whether a visa application constitutes a claim for money such that an FCA claim may be predicated upon it. It is axiomatic that it is not. A visa application does not request money in any way, shape, or form. Certainly, visas might hold some intrinsic value—they are, at least, valuable insofar as they authorize foreign employees to work in the United States.[10] But a visa, on its own, does not possess any *pecuniary* value that would qualify it as "money." The United States Mint does not print visas. Visas cannot be sold, nor can they be exchanged for value. It is unsurprising, then, that Relator does not even advance an argument that an application for a visa constitutes a claim for money under the FCA (*See* Dkt. #74). Thus, the Court concludes that visas do not constitute money.

Having determined that a visa is not money for purposes of an FCA claim, Relator's only remaining hope is to classify Tata's visa applications as claims for property. *See* 31 U.S.C. § 3729(b)(2). Relator attempts to do just that in his Amended Complaint, where he argues that Tata "deprive[d] the government of its property interest in thousands of visas" (Dkt. #64 at ¶ 8). Tata opposes that classification and directs the Court to two recent opinions from our sister courts in the Districts of New Jersey and Connecticut (Dkt. #65 at pp. 14–16) (citing *Franchitti*, 555 F. Supp. 3d at 69; *United States ex rel. Billington v. HCL Techs. Ltd.*, No. 3:19CV01185(SALM), 2022 WL 2981592, at *7 (D. Conn. July 28, 2022), *aff'd*, 126 F.4th 799 (2d Cir. 2025)). The Court will discuss

---

[10] U.S. Department of State – Bureau of Consular Affairs, *U.S. Visas, What is a U.S. Visa?*, TRAVEL.STATE.GOV, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/frequently-asked-questions/what-is-us-visa.html.

both in turn. But first, the Court turns to *Cleveland v. United States*, which provides the foundation upon which *Franchitti* and *Billington* stand. 531 U.S. 12 (2000).

*Cleveland* asked the United States Supreme Court to determine whether the federal mail fraud statute, 18 U.S.C. § 1341, reaches false statements made in an application for a state video poker machine license. *Id.* at 15. Justice Ginsburg, writing for a unanimous Court, held that a government regulator does not part with "property" when it issues a license because "such a license is not 'property' in the government regulator's hands." *Id.* at 20. In reaching that holding, the Court emphasized that the state's interest in the licenses pre-issuance was "purely regulatory" with no inherent commercial or economic value. *Id.* at 22. And while the state may exercise the familiar property rights of "allocati[ng], exclu[ding], and control[ling]" the distribution of the licenses, the Court viewed those rights as flowing from "Louisiana's sovereign power to regulate," rather than a property interest. *Id.* at 23.

Courts applying *Cleveland* to the FCA have similarly held that licenses do not fall within traditional concepts of property rights. *See, e.g.*, *United States v. Majestic Blue Fisheries, LLC*, 196 F. Supp. 3d 436, 445 (D. Del. 2016) (holding that fishing licenses are not "property" because the right to fish using a fishing license "does not exist independent of a 'regulatory regime'"); *Franchitti*, 555 F. Supp. 3d at 69 (applying *Majestic Blue* to the visa context and holding that a visa is not property because such a "'purely regulatory' scheme does not invoke traditional property rights"); *Billington*, 2022 WL 2981592, at *7 (following *Franchitti* and holding that a visa is not property under the FCA). Relevant here are *Franchitti* and *Billington*, which Tata urges the Court to follow (Dkt. #65 at pp. 14–16).

First came *Franchitti*, where, under facts strikingly similar to those before the Court today, the United States District Court for the District of New Jersey was tasked with determining whether a visa could be construed as "property" under the FCA's definition of "claim." *Franchitti*, 555 F. Supp. 3d at 69. Using the Supreme Court's reasoning in *Cleveland*, the court held in the negative. *Id*. The court noted that, like the licenses in *Cleveland*, "a visa has no value to the government beyond the revenue stream from application fees." *Id*. Rather, the court explained, a visa simply "'licenses . . . engagement in pursuits that private actors may not undertake without official authorization.'" *Id*. (quoting *Cleveland*, 531 U.S. at 13). Namely, a visa authorizes foreign workers to enter the United States to perform paid services, provided that they comply with immigration regulations. *Id*. According to the *Franchitti* court, the level of control that the government exercises over the number of visas issued and how those visas are allocated is "purely regulatory" and does not resemble traditional property rights. *Id*. Thus, the court dismissed the relator's affirmative FCA claims. *Id*.

The following year, the United States District Court for the District of Connecticut was presented with a nearly identical question in *Billington*. 2022 WL 2981592. The court's analysis is more terse than that in *Franchitti*, but its conclusion is no less persuasive. *Id*. at *5–7. Relying on *Franchitti*, *Majestic Blue*, and *Cleveland*, the court declined to expand FCA liability to encompass visas as a form of property because to do so would "'fundamentally change[] the relationship between the FCA and garden-variety regulatory violations.'" *Id*. at *6 (quoting *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019)). Accordingly, the court dismissed the FCA claims that relator asserted under 31 U.S.C. §§ 3729(a)(1)(A) and (B).

The Court will do the same here. Extending FCA liability to reach visas as a form of property would require the Court to ignore its numerous sister courts which have declined to punish such "garden-variety regulatory violations." *Billington*, 2022 WL 2981592, at *6 (quoting *Kasowitz*, 929 F.3d at 728); *see also Franchitti*, 555 F. Supp. 3d at 69; *Majestic Blue*, 196 F. Supp. 3d at 444–45. The Court refuses to turn such a blind eye. Like the video poker machine licenses in *Cleveland* and the fishing licenses in *Majestic Blue*, the right of a foreign worker to perform paid services in the United States using a visa does not exist independent of a "regulatory regime." *Compare Majestic Blue*, 196 F. Supp. 3d at 445 *and Cleveland*, 531 U.S. at 13, *with Billington*, 2022 WL 2981592, at *7 and *Franchitti*, 555 F. Supp. 3d at 69. Consequently, Relator's affirmative claims asserted under 31 U.S.C. §§ 3729(a)(1)(A) and (B) are **DISMISSED**.

## II.     Relator's Reverse FCA Claims

With Relator's affirmative FCA claims put to rest, the Court turns to his reverse FCA claims. The FCA prohibits "reverse false claims," which arise when a person "knowingly makes, uses, or causes to be made or used, a false statement material to an obligation to pay or transmit property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Unlike affirmative false claims, which cover payments made *by* the government to the defendant, reverse false claims involve the defendant's avoidance of a payment *to* the government when the defendant is obligated to make that payment. *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

Relator advances two reverse false claim theories. First, Relator contends that by employing foreign workers on the cheaper B-1 and L-1A visas instead of H-1B visas, Tata has "deprive[d] the

government of . . . significant revenue that would otherwise be derived from visa application fees" (Dkt. #64 at ¶ 8). Second, Relator avers that Tata's practice of underpaying H-1B workers and its reliance on visa-reliant employees deprived the United States government of "significant tax revenue" that "would have been generated from the employment of non-visa reliant workers" or from Tata's payment of higher wages to H-1B employees (Dkt. #64 at ¶¶ 38, 43, 46, 48; Dkt. #65 at p. 17).

Tata seeks to dismiss Relator's reverse FCA claims on the basis that Relator failed to plausibly plead an "obligation" that Tata subsequently shirked. Critical to a successful reverse false claim is a showing that the defendant had an "obligation" to pay or transmit money to the government. *See* 31 U.S.C. § 3729(a)(1)(G). The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* § 3729(b)(3). It is here that Tata argues Relator's reverse false claims must fail. Tata submits that Relator has not plausibly alleged that Tata had any obligation to pay the government, much less that it avoided or decreased that obligation (Dkt. #65 at p. 16). Instead, Tata argues that Relator alleges only "'contingent, speculative, or potential obligation[s]'" that are not actionable under the FCA (Dkt. #65 at p. 16) (quoting *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338 n.141 (S.D.N.Y. 2004)). Tata also opposes Relator's claims related to the loss of tax revenue on the basis that the FCA "Tax Bar" precludes reverse false claims that seek to recover lost tax revenue (Dkt. #65 at pp. 20–22) (citing 31 U.S.C. § 3729(d)). The Court begins by analyzing whether Tata had an obligation under the FCA.

Relator's reverse false claims are predicated on Tata's alleged obligation to pay the higher fees associated with securing H-1B visas, which Relator argues Tata avoided by fraudulently securing L-1A and B-1 visas instead (*See* Dkt. #64 at ¶¶ 38, 43, 46, 48). Tata insists that it had no obligation to pay H-1B fees (*See* Dkt. #65 at pp. 16–20). Instead, Tata contends that "any obligation [Tata] had to pay the fees associated with H-1B visas was contingent on [Tata] actually applying for those visas and receiving them in the government lottery" (Dkt. #65 at p. 20). The Court agrees with Tata.

Once more, to plausibly state a reverse FCA claim, the relator must identify an "obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Importantly, however, "the reverse false claims act does *not* extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed." *Bain*, 386 F.3d at 657; *see also Marcy*, 520 F.3d at 391. Here, Tata's obligation to pay the H-1B visa fee was just that— contingent. Relator contends that Tata applied for L-1A and B-1 visas for work that required an H-1B visa (Dkt. #64 at ¶¶ 43, 46). But L-1A and B-1 applications—even those submitted fraudulently—do not trigger the $6,460 H-1B application fee. Indeed, only an H-1B application can trigger the corresponding H-1B fee. Put differently, Tata's obligation to pay the H-1B visa fee was contingent upon it applying for an H-1B visa. Applying for L-1A and B-1 visas in their place did not trigger any obligation to pay an H-1B visa fee because Tata did not apply for an H-1B visa for those positions. And because "the obligation to pay the government only arises upon *applying* for a visa," Tata only owed the $5,460 and $160 fees associated with its L-1A and B-1 applications, respectively. *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923 (N.D. Cal. 2019) (emphasis in original). Simply put, Tata had no obligation to pay fees for visas it never sought.

The Court's conclusion finds support in recent FCA jurisprudence. *See, e.g., Lesnik*, 374 F. Supp. 3d at 940 (noting that "there was no *obligation* to pay the government for a petition-based visa because no visa application for a petition-based visa was ever actually submitted"); *Billington*, 2022 WL 2981592, at *10 (following *Lesnik* and dismissing the plaintiff's reverse FCA claims because "any purported obligation to pay [H-1B] fees was entirely contingent on the visa lottery process"). The Court briefly illustrates each below.[11]

In *Lesnik*, the plaintiffs asserted that the defendants brought foreign workers to the United States "on B-1 visas that are generally reserved for skilled work, even though [the defendants] allegedly knew the workers would actually be performing unskilled construction work." *Lesnik*, 374 F. Supp. 3d at 934. The plaintiffs brought a reverse FCA claim against the defendants, asserting that "because Defendants falsely obtained cheaper B-1 visas, they avoided an obligation to pay the government the higher fees associated with the more expensive unskilled worker visa." *Id.* at 939 (cleaned up). The court disagreed. *Id.* at 940–41. In the court's view, payment of the higher petition-based fee was not an obligation upon which a reverse FCA claim could lie. *Id.* at 940. The court reasoned that any obligation to pay the H-1B visa fee was only *potential*; the obligation could only arise if the defendant actually applied for the petition-based visas. *Id.* And because the defendants never applied for an H-1B visa—only the cheaper B-1 visas—they never triggered the obligation to pay the H-1B fee. *Id.* Thus, the court dismissed the plaintiffs' reverse FCA claims. *Id.*

Then came *Billington*. 2022 WL 2981592. Like its affirmative FCA analysis, the Court finds *Billington*'s reverse FCA analysis equally persuasive. There, the court recounted the FCA's history

---

[11] As discussed, Tata also directed the Court to *United States ex rel. Kini v. Tata Consultancy Servs., Ltd.*, to which Tata was also a party (Dkt. #79) (citing 2024 WL 474260). While the District of Columbia's analysis in *Kini* comports with the Court's analysis today, the Court does not rely on *Kini* in arriving at its conclusion.

since it was amended as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA") to add the definition of "obligation" to the statute "to address 'conflicting definitions of the term obligation' that had developed among the federal courts." *Id.* at \*9 (quoting *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016)). To reiterate, that definition now reads: "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The plaintiffs in *Billington* argued that the new definition encompassed both "fixed and contingent duties owed to the Government." 2022 WL 2981592, at \*10. The court rejected that argument. *Id.* With a nod to the "majority of courts" who have interpreted the definition the same way, the court noted that "'the most reasonable interpretation' of the definition of obligation 'is that 'established' refers to whether there is *any* duty to pay, while 'fixed' refers to the *amount* of the duty.'" *Id.* (quoting *Simoneaux*, 843 F.3d at 1037). After considering the newly-defined "obligation" under the 2009 FERA amendments and *Lesnik*'s interpretation of the definition, the court concluded that "defendants could not submit an [H-1B] visa application without first having been selected in the lottery. Thus, any purported obligation to pay fees was entirely contingent on the visa lottery process." *Id.* Accordingly, the court dismissed the plaintiffs' reverse false claims. *Id.* at \*11.

That leaves the reverse FCA outlier: *Franchitti.* 555 F. Supp. 3d. As persuasive as the Court finds *Franchitti*'s affirmative FCA analysis, *supra* at 16, the Court disagrees with its reverse FCA conclusion. In evaluating whether the defendant had an "obligation" to pay the higher H-1B visa fees, the court rejected the more factually similar analysis in *Lesnik* in favor of more factually

distinct cases in which the court found the defendant was obligated to pay money to the Government. *Id.* at 70 (citing *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236–37 (11th Cir. 1999) (finding that the defendant had an "obligation" giving rise to reverse FCA liability when it misrepresented the true value of the equipment it purchased from the United States Air Force); *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 245–46, 254–55 (3d Cir. 2016) (concluding that the defendant's importation of improperly marked pipe fittings without reporting them as such, thereby avoiding a 10% marking duty, constituted an "obligation" under the FCA)). The court analogized the visa application process to the procurement of Air Force equipment and failure to adequately mark pipe fittings and found that "[the defendant's] obligation to pay the correct visa application fee accrued upon its submission of the visa application." *Franchitti*, 555 F. Supp. 3d at 71. That "obligation," the court reasoned, arose from the "privileges associated with [the defendant's] desired visa," which the court characterized as an "implied contractual" or "fee-based" relationship under 31 U.S.C. § 3729(b)(3). *Id.*

The Court disagrees with *Franchitti*'s expansive approach. *See Billington*, 2022 WL 2981592, at *10 (rejecting *Franchitti*'s holding because it "expand[s] FCA liability beyond that contemplated by Congress"). A close reading of *Pemco* and *Victaulic* reveals that those cases are distinguishable. In *Pemco*, the Eleventh Circuit determined that "Pemco had a written contract which *expressly* obligated Pemco to be responsible and accountable for the government property in its possession and to return that property to the government or dispose of the property in accordance with the government's instructions." *Pemco*, 195 F.3d at 1237 (emphasis added).[12] Thus,

---

[12] The Court notes here—as the *Billington* court did—that *Pemco* was decided a decade before the 2009 FCA amendments. *See id.* at 1234; *see also Billington*, 2022 WL 2981592, at *11. Thus, the Eleventh Circuit interpreted "obligation" before the FCA had formally defined that term. *Compare Pemco*, 195 F.3d 1236, with 31 U.S.C. § 3729(b)(3).

Pemco's contract with the government created a "specific legal obligation" to dispose of the property on the government's terms. *Id.* That obligation existed at the time Pemco misrepresented the government. *See id.* In other words, the duty was "established," as required by 31 U.S.C. § 3729(b)(3). *See id.*; *see also United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1231 (10th Cir. 2017) ("[A] duty to pay must be formally 'established' before liability can arise under the False Claims Act."). Here, no such contract exists. Indeed, Tata could trigger its "duty to pay" the applicable H-1B visa fee to the Government only after submitting an H-1B application and being selected in the lottery. *See Billington*, 2022 WL 2981592, at *10. Accordingly, because it elected to apply for L-1A and B-1 visas instead, the only "established" obligation that Tata took on was the obligation to pay the L-1A and B-1 fees. *See id.* ("[A]t the time of the alleged misconduct, the only 'established' obligation was payment for the visa applications *actually submitted*.").

*Victaulic* fares no better. There, the Third Circuit performed a reverse FCA analysis in the context of improperly marked pipe fittings. *Victaulic*, 839 F.3d at 253–56. The defendant in *Victaulic* allegedly "imported millions of pounds of improperly marked pipe fittings without disclosing that the fittings [were] improperly marked," which allowed the defendant to avoid paying a 10% "marking duty" on the improperly marked goods. *Id.* at 245–46. The Third Circuit allowed the reverse FCA claim to proceed because the defendant importer's obligation to pay the 10% marking duty was "deemed to 'have accrued at the time of importation' and [was] due and owing, without exception." *Id.* at 254 (quoting 19 U.S.C. § 1304(i)). The same logic applies here, though it compels the opposite conclusion. As the Court has made clear, Tata's obligation to pay the H-1B visa fee could not accrue unless and until it applied for an H-1B visa. Having not done so, Tata is not responsible for a debt that it did not incur. *Victaulic* is therefore distinguishable on that critical basis.

But that is not the only distinction. *Victaulic* is further distinguishable because it relied, in part, on legislative history—which the Court in no way relies upon here. *See Victaulic*, 839 F.3d at 254. *United States v. Dixon*, 185 F.3d 393, 399 (5th Cir. 1999) ("[T]he legislative history of a statute may not compel a meaning at variance with its plain language.") (internal quotations omitted). In *Victaulic*, the FERA's legislative history contemplated the precise issue presented in that case. *See* S. REP. NO. 111-10, at 24 n.10 (2009). Namely, the Senate Report discussed how it would handle "customs duties for mismarking country of origin" under the new "obligation" definition. *Id.* The report observes that an earlier FERA proposal specifically listed "marking duties" in the definition of "obligation," but did not make it into the final version because "customs duties clearly fall within the new definition of the term 'obligation' absent an express reference and any such specific language would be unnecessary." *Id.* The Third Circuit considered the Senate Report of "particular importance" in conducting its reverse FCA analysis. *Victaulic*, 839 F.3d at 254. Thus, it is unsurprising that the Third Circuit considered the 10% marking duty an obligation that could support a reverse FCA claim—which the Senate Report expressly considered.

Here, unlike *Victaulic*, the Court need not review the legislative history. Indeed, the plain text of the statute, as interpreted by the foregoing caselaw, compels only one conclusion: Tata had no "obligation" to pay fees for applications it never submitted. Though the Court has no reason to engage with the FERA's legislative history, even if it did peel back that curtain, what lies behind offers no guidance. *Cf. Victaulic*, 839 F.3d at 254 (citing S. REP. NO. 111-10 (2009)). Thus, *Victaulic* is distinguishable. Therefore, *Franchitti*'s reliance upon it is unpersuasive. Accordingly, neither opinion controls the Court's analysis here.

Shifting course, the Court turns to Relator's wage-related reverse FCA claims. To the extent Relator argues that Tata was obligated to pay its employees the higher of the actual wage or prevailing wage—and failed to fulfill that obligation—that argument necessarily concedes that Tata owed no such obligation to the *Government*. Indeed, Tata's obligation, if any, to pay its employees a higher wage, was owed to its *employees*, not to the Federal Government. *See* 20 C.F.R. § 655.731(a). That is not the type of obligation that the FCA covers. *See* 31 U.S.C. § 3729(a)(1)(G) (imposing FCA liability only for persons who avoid "obligations . . . to the *Government*") (emphasis added). Of course, Relator counters by arguing that, by virtue of underpaying its employees, Tata decreased its payroll tax obligations to the Government (Dkt. #74 at p. 22) (citing 26 U.S.C. § 3111(a)). So, the argument goes, lower wages create lower payroll taxes, which, in turn, deprives the Government of additional tax revenue (*See* Dkt. #74 at pp. 23–24). Notwithstanding the attenuation of that argument, Tata's tax obligations are contingent upon the amount it pays its employees. Again, that will not do under the FCA. "[O]nly *if* [Tata] *had* paid higher wages, would there have been any obligation to pay the higher . . . taxes." *Billington*, 2022 WL 2981592, at *11. Because Tata did not, its tax-related obligations were "contingent obligations to pay the government," which are not actionable under the FCA. *Bain*, 386 F.3d at 657; *see also Marcy*, 520 F.3d at 391.

For the foregoing reasons, Relator's allegations in his Amended Complaint do not demonstrate that Tata had any "established duty" at the time of its alleged visa fraud that could support a reverse FCA claim. Consequently, Relator's reverse FCA claims asserted under 31 U.S.C. § 3729(a)(1)(G) are **DISMISSED**.

Finally, having determined that Relator has not plausibly pleaded a claim for relief under the FCA—whether affirmative or reverse—the Court need not take up Tata's remaining bases to

dismiss Relator's Complaint (Dkt. #65 at pp. 20–26) (moving to dismiss Relator's Complaint based on the FCA "tax bar" and Relator's alleged failure to comply with the Rule 9(b)'s heightened pleading standards).

## CONCLUSION

It is therefore **ORDERED** that Defendant Tata Consultancy Services Limited's Motion to Dismiss Amended *Qui Tam* Complaint (Dkt. #65) is hereby **GRANTED**.

Because any amendment of Relator's Complaint would not fix its legal deficiencies, Relator's Amended *Qui Tam* Complaint (Dkt. #64) is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

**SIGNED this 20th day of May, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE